Filed 12/13/22  Smith v. California Coastal Commission CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| STEPHANIE SMITH, as Trustee of the Lovely Family Trust,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CALIFORNIA COASTAL COMMISSION et al.,<br><br>    Defendants and Respondents. | B313040<br><br>(Los Angeles County Super. Ct. No. 20STCP00783) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Law Office of Richard Jacobs and Richard Jacobs for Plaintiff and Appellant.

Rob Bonta, Attorney General, Daniel A. Olivas, Senior Assistant Attorney General, Andrew M. Vogel, Supervising Deputy Attorney General, and Justin J. Lee, Deputy Attorney

General, for Defendant and Respondent California Coastal Commission.

Michael N. Feuer, City Attorney, Terry Kaufmann Macias, Assistant City Attorney, and Amy Brothers, Deputy City Attorney, for Defendant and Respondent City of Los Angeles.

Stephanie Smith, in her capacity as trustee of the Lovely Family Trust (the Trust), challenges the California Coastal Commission's (CCC's) denial of the Trust's application to demolish a 2,634 square foot house on a bluff in Pacific Palisades and build a nearly 20,000 square foot residential compound in its place. The trial court upheld the CCC's decision in administrative mandamus proceedings. We are asked to decide whether the trial court properly disposed of certain issues on demurrer and the sole claim that remained after the demurrer ruling—an alleged procedural due process violation arising from the omission of a single document from a CCC staff report—on a motion for judgment on the writ.

## I. BACKGROUND
### A. *The Property and CCC Jurisdiction*

The Trust owns real property located on Puerto Del Mar in the Pacific Palisades neighborhood of Los Angeles. The site consists of two adjoining lots totaling approximately 26,580 square feet on a bluff overlooking Pacific Coast Highway. It is currently occupied by a 2,634 square foot single family home built in the 1950s.

The site has been plagued by landslides for decades, landslides that threaten a mobile home park below. In 2011, the City of Los Angeles (the City) ordered the property's previous owner to remedy the "general safety hazard" presented by the "destabilized . . . slope face." No remediation was performed before the Trust purchased the property in 2013—knowing that the site would require remediation as ordered by the City.

In 2015, the City approved the Trust's plans for landslide repair, including construction of a retaining wall and removal

3

and re-compaction of landslide debris.  About a year later, the City separately issued a local coastal development permit approving the demolition of the existing residence and construction of several new structures, including "a 12,417 [square foot] residence, a 3,778 [square foot] habitable basement, a 1,671 [square foot] accessory dwelling unit, 2,060 [square feet] of garage area," and two pools.  The project also required "4,100 cubic yards of remedial grading."

The CCC determined the property is located in what is known as a dual permit jurisdiction area, meaning the Trust "must obtain a [coastal development] permit from the local entity [i.e., the City] and after obtaining the local permit, a second permit from the [CCC]." (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 794.)  In this case, the dual permit requirement is the product of the City's exercise of its authority under Public Resources Code[1] section 30600, subdivision (b)(1), which empowers local governments without a CCC-certified local coastal program to establish procedures for approving coastal development permits, and another provision of the California Coastal Act (§ 30000 et seq.) requiring that certain developments approved in this manner also obtain a CCC permit.  These include developments located "within 300 feet of the top of the seaward face of any coastal bluff." (§ 30601, subd. (2).)

Independent of the dual permit area determination, permitting approval by the CCC was also required for the Trust's proposed construction and landslide repair because the CCC's

---

[1]     Undesignated statutory references that follow are to the Public Resources Code.

executive director appealed the City's permit approval to the CCC and the CCC determined the approval raised substantial issues with respect to geologic hazards, landform alteration, visual resources, and community character. (§ 30602; *Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564, 569 ["If the [CCC] determines that an appeal presents a 'substantial issue,' the permit application is reviewed de novo; in effect, the [CCC] hears the application as if no local governmental unit was previously involved, deciding for itself whether the proposed project satisfies legal standards and requirements"].)

### B. The CCC Permit Application
#### 1. Application and correspondence with CCC staff

The Trust submitted its permit application to the CCC in July 2018. About a month later, CCC staff sent a letter notifying the Trust the application had been deemed incomplete and the Trust would need to submit a grading plan indicating the locations of proposed caissons and a retaining wall, drainage and runoff plans, an analysis of the development's visual impact from various locations, and an analysis of development alternatives. With respect to the alternatives analysis, the CCC sought information relevant to whether the proposed development represented "the *minimum* amount of landform alteration required to stabilize the bluff" and requested "a comprehensive set of alternatives, including, but not limited to: 1) smaller amounts of grading; 2) alternatives to caissons/retaining walls; [and] 3) a smaller single-family residence."

The Trust's response to the request for more information regarding development alternatives (a focus of the Trust's arguments for reversal) had two components.

5

First, the Trust submitted a letter from its engineer running just over two pages that suggested, among other things, building into the bluff provided "stabilization support" that would be "more effective and aesthetically pleasing" than retaining walls and, if the design were "reduced or significantly altered, stabilizing and restoring the slope . . . [would] require more piles and retaining walls than currently required in the proposed design . . . ." The engineer's letter refers to "extensive analyses of potential alternatives" but does not discuss these in any detail.

Second, the Trust submitted a single-page plan (the Diagram) for an alternative design drawn by the Trust's architect; in this alternative design, the site is divided into two parcels with a separate residence on each. The Diagram features an 8,300 square foot home (plus two basement levels) and a 5,000 square foot home (plus one basement level) and proposes a total "buildable area" of 37,000 square feet.[2] As described in the Trust's attorney's cover letter, the Diagram shows that "if the two parcels comprising the project were to be developed independently, over 30,000 square feet of residential structures could be constructed by right without any variances[,] which would be substantially larger than the proposed project."

CCC staff confirmed receipt of these additional documents in September 2018 and stated they would "review the materials within the next week or so[ ] and let [the Trust] know if additional information [was] needed." The Trust sent several

---

[2] The Diagram sketches only the lot lines and perimeter of each structure. There is no written analysis suggesting, for example, this proposal requires less landform alteration than a potential plan for two smaller homes.

6

follow-up emails over the next couple months to check the status of its application, and CCC staff replied in November 2018 that the project was "still under review." More than a year later, in January 2020, the Trust sent multiple emails to CCC staff regarding its application, culminating in a request that the CCC "confirm" within one week "that the permit/clearances will be issued" or the Trust would seek to compel compliance.

That same month, CCC staff informed the Trust it needed "a number of additional materials . . . to adequately analyze the project." Among other things, CCC staff indicated the Trust's grading plans and alternatives analysis did not address issues raised in 2018. Specifically, staff did not have sufficient information to determine whether proposed caissons and retaining walls represented the minimum necessary to stabilize the bluff, and the Trust failed to analyze the possibility of a smaller single family residence. CCC staff noted they had received the Diagram for two homes, but this "did not provide any further details or context of the two residences which would be necessary to understand the extent and scope of the proposed alternative for a meaningful analysis." The Trust responded it had "fully complied" with all of the CCC's requests and it would "figure out [its] next steps" based on guidance at the hearing on its application.

CCC staff prepared a report prior to the hearing before the CCC itself. The staff report recommended the agency deny the Trust's permit application because the proposed development is inconsistent with Coastal Act provisions regarding community character, visual resources, landform alteration, and geologic

7

hazards. (§§ 30251, 30253.[3]) The features of the proposed development cited in the report as problematic include the proposed new construction's prominent position atop the bluff and down its otherwise largely undeveloped face,[4] the development's size relative to nearby homes,[5] its reliance on bluff

---

[3] Section 30251 states "[t]he scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance. Permitted development shall be sited and designed to protect views to and along the ocean and scenic coastal areas, to minimize the alteration of natural land forms, to be visually compatible with the character of surrounding areas, and, where feasible, to restore and enhance visual quality in visually degraded areas. New development in highly scenic areas . . . shall be subordinate to the character of its setting."

Section 30253 states new development shall, among other things, "[a]ssure stability and structural integrity, and neither create nor contribute significantly to erosion, geologic instability, or destruction of the site or surrounding area or in any way require the construction of protective devices that would substantially alter natural landforms along bluffs and cliffs." (§ 30253, subd. (b).)

[4] The report states: "The proposed residential compound would cover nearly the entire 26,580 square foot site and would be 53 feet tall, cascading down the 240 foot high bluff—a coastal bluff where currently no significant development exists for approximately 1,000 feet along the coastal bluff edge or face. As proposed[,] the residential compound would stand out dramatically from the surrounding development, leaving an indelible mark on a relatively undisturbed portion of the bluff that is highly visible from PCH and the beach from the south, west, and north."

[5] The staff report notes "the floor area of homes in the neighborhood ranges between 688 square feet and 6,434 square

8

protective devices such as caissons and retaining walls,[6] and the absence of support for the Trust's assertion that the proposed development represents the least impactful option for stabilizing the property.[7]

---

feet.  The floor area of the average residence was estimated to be 2,778 square feet.  At 19,827 square feet (including the garage, basement, and accessory structure), the proposed residence would be more than three times as large as the next largest residence, and more than nine times the size of an average-sized home in the area."

[6]      The report explains "public views along the coast can be affected as the coastal bluffs retreat landward due to the natural process of erosion, thereby exposing the protective devices in whole or in part."  Additionally, "caissons can . . . cause erosion, loss of natural landforms, and other impacts if they ever need to be removed."  Consequently, "[i]n cases where blufftop protective devices have been permitted for geologic stability, the [CCC] typically prohibits the use of protective devices for accessory structures (including decks, pools, and even yards) in order to minimize grading, landform alteration, and future view impacts."

[7]      The report emphasizes "[t]he [CCC]'s geologist and senior engineer . . . reviewed the available project information, and . . . concluded that there is likely a wide array of conceptual alternatives for stabilizing portions of the site, sufficient to support new development or the refurbishment of the existing home.  Such alternatives could use various combinations of grading, bluff retention systems (e.g., caissons, walls), and/or deepened foundations, and would need to be evaluated for technical feasibility and efficacy.  Any viable alternatives would also likely result in some degree of landform alteration or other coastal resource impacts (e.g., to visual quality).  Without a rigorous analysis of these factors, there is no basis to conclude

9

The staff report attached various appendices and exhibits, including the Trust's response to the August 2018 notice of incomplete application. It did not, however, include the single-page Diagram among these materials.

### 2. Hearing

The CCC held a public hearing on the Trust's permit application in February 2020. CCC staff and the Trust's attorney gave presentations.[8] The Diagram (or its absence in the materials submitted with the staff report) was not mentioned by anyone.

The panel of six commissioners voted unanimously to deny the permit and adopted the recommended findings set forth in the staff report. Most of the commissioners also made oral remarks during the hearing regarding their views of the proposed development. A sampling includes the following:

- Commissioner Caryl Hart: "[T]he development, as proposed, violates the Coastal Act. For us to approve it, we would approve violations of the Coastal Act. The bluff itself, as is described in the report, looms over Highway One, Will Rogers State Beach, Sylmar View Park, and Las Pulgas Canyon, which are very valuable coastal resources . . . . I'm having a very hard time understanding how the applicant could propose a 19,827 square foot, 53 foot tall compound, which really it is—with that kind of

that the substantial landform alteration that would result from the proposed project has been minimized."

[8] Several members of the public also spoke to express their opposition to the development.

10

impact on visual resources. It's almost as if the Coastal Act doesn't exist. To me, it's such a blatant, clear violation of Section 30251 [scenic and visual qualities] of the Coastal Act, I can't exactly comprehend the proposal, frankly."

- Commissioner Mike Wilson: "I agree with the staff, with relationship to [Coastal Act] Sections 30251 and 30253 [stability and structural integrity]—I concur."
- Vice Chair Donne Brownsey: "[T]his project, to me, fails on a number of grounds . . . articulated well in the Staff Report. Besides being an extremely hazardous area, which I don't believe the project addresses sufficiently, for not only the safety of the residents, but also the safety for their neighbors. I think it's really out of scale, given the community character, and certainly the visual resources, with respect to . . . the beach . . . and the community, and the highway . . . ."[9]
- Chair Steve Padilla: "I think this record is replete with sufficient evidence to demonstrate that there is substantial concern regarding development in geological hazardous areas, and impacts to visual resources. [I d]on't think we need to go much further than that."
- Commissioner Roberto Uranga: "Taking in all the comments from my colleagues, there's . . . only one way to vote on this."

---

[9]     Vice Chair Brownsey also asked, "is this not an extremely hazardous area, and a proposal for which we would need an incredible amount of technical information before we could proceed?"

11

In addition to these statements (and as we discuss more fully *post*), the Trust in this appeal also calls attention to a line of inquiry by Commissioner Katie Rice addressing whether the bluff might be "completely unbuildable" given that "they [i.e., the Trust] don't have a lot of footprint to work with."

### C. *The Administrative Mandamus Proceedings*
#### 1. *Petition, demurrers, and amended petitions*

The Trust challenged the denial of its permit application by filing a combined petition for administrative mandamus and complaint for declaratory relief naming both the CCC and the City as defendants and respondents. As styled by the Trust, the petition and complaint alleged two enumerated causes of action: an administrative mandamus cause of action and a cause of action for declaratory relief. These enumerated causes of action, however, alleged multiple theories of liability: (1) the CCC denied its permit application because the Trust had not provided enough information about the proposed development, which, in the Trust's view, was improper because the CCC was required to issue a notice of incomplete application within 30 days of receipt of the Trust's supplemental materials in September 2018 pursuant to the Permit Streamlining Act (Gov. Code, § 65920 et seq.); (2) the staff report omitted "various items"; (3) provisions of the Coastal Act addressing community character and visual resources are void for vagueness; and (4) the Trust was given disfavored treatment because CCC staff did not provide it with support extended to other applicants. The petition and complaint also sought a declaration that the City's order to comply "supersede[d]" the CCC's analysis of community character and

visual impact and, in the alternative, the City's order to comply with landslide remediation was "void for impossibility."

The CCC and the City demurred to the Trust's petition and complaint. The CCC argued: the Permit Streamlining Act issue was moot because the agency denied the application on its merits, the Coastal Act was not unconstitutionally vague, the Trust did not allege an outrageous or egregious abuse of power sufficient to establish a violation of its substantive due process rights, and state law preempted the City's order to comply. The City argued, among other things, that the Trust's claim against the City was not ripe because the Trust unjustifiably assumed the CCC would not approve alternative plans to comply with the City's order to rehabilitate the hillside.

As to the City's demurrer, the trial court sustained it without leave to amend. As to CCC's demurrer, the trial court sustained it but gave the Trust "leave to amend on . . . two issues only": "[O]ne, did the [CCC] adopt the staff report, yes or no? And two, did the staff report leave out instructions to affect anything that the [Trust] submitted and, if so, what is the prejudice to the [Trust]?" The trial court emphasized that the Trust had, "at most," a potential argument that its procedural due process rights were violated.

The Trust thereafter filed a first amended petition and complaint, and at a trial setting conference about a month later, the CCC argued the Trust's first amended petition did not conform to the trial court's earlier order because it raised issues on which the trial court had already ruled and because it failed to allege the Trust was prejudiced by any omission from the staff report. With respect to "grounds that were raised on demurrer . . . with which the court agreed in its ruling," the trial

13

court stated "there's no reason to re-raise that or make a motion to strike or anything. Those are by the wayside as far as I'm concerned. . . . All that is left is what I gave [the Trust] to amend to allege [sic]." As to the Trust's failure to amend and allege prejudice from anything missing in the report staff submitted to the CCC, the trial court issued an order to show cause "for dismissal for failure to properly amend." The Trust then prepared a second amended petition and, when the CCC indicated it planned to demur because the Trust had still not alleged prejudice, the trial court allowed the Trust a final opportunity to amend.

The Trust's third amended petition and complaint is the operative pleading. The document is substantively identical to the Trust's earlier pleadings but for the addition of allegations that attempt to demonstrate prejudice to the Trust from omissions in the CCC staff report. Among other things, the amended pleading alleges the CCC would have approved the development if staff had included all pertinent documents in its report because at least two commissioners indicated they needed additional information. In particular, the pleading quoted Vice Chair Brownsey's comment regarding the need for "an incredible amount of technical information" and Commissioner Rice's query as to whether the lots had become "unbuildable."[10]

---

[10] The third amended petition also alleges the CCC "would have approved the project because the Floor Area Ratio on the project compared to other new construction in the neighborhood shows that this project is of a similar character to others already that were approved [sic]." The petition does not, however, allege the Trust submitted these data to CCC staff.

14

### 2. *Motion for judgment on the writ*

Once the third amended petition and complaint was filed, CCC filed a motion for judgment on the writ pursuant to Code of Civil Procedure section 1094 (Section 1094). The CCC argued the Trust's procedural due process claim (alleging omissions in the staff report, i.e., the one-page Diagram) failed as a matter of law because the Trust did not exhaust its administrative remedies and could not demonstrate prejudice from the missing Diagram.

The Trust's opposition to the motion for judgment advanced procedural and substantive arguments. Procedurally, the Trust argued the motion for judgment was not timely served, the CCC was not entitled to rely on extrinsic evidence (specifically, documents from the proceedings before the CCC), and the motion should be denied because no administrative record had by then been prepared. Substantively, the Trust argued the motion was premature because there were disputed issues of fact (chiefly concerning the basis for the CCC's decision) and the CCC's unclean hands precluded application of the administrative exhaustion doctrine.

The trial court granted the CCC's motion for judgment. As we shall discuss in more detail, the trial court determined the Trust was not prejudiced by untimely service of the motion. The trial court rejected the Trust's remaining procedural objections because the motion was properly based on "undisputed facts that necessarily would be included in the administrative record" which "ha[d] not been prepared solely because of [the Trust's]

15

failure to pay a necessary deposit." On the merits,[11] the trial court found the Trust had not exhausted its administrative remedies by failing to alert the commissioners to the omission of the Diagram from the staff report. The trial court also found, alternatively, that there was no prejudice from the absence of the Diagram in the staff-submitted materials because the CCC did not deny the Trust's permit application because it was incomplete and the Diagram would not have impacted its analysis.

## II. DISCUSSION

The Trust's appeal of the judgment proceeds on (at most) three fronts. None is meritorious.

The Trust continues to press its procedural arguments against the motion for judgment on the writ. The trial court, however, did not abuse its discretion in hearing the motion for judgment despite its being served on the Trust two days late, and the ruling was based on undisputed facts. The Trust's contention that the trial court needed to address more than its procedural due process claim in its motion for judgment ruling because the court had impermissibly "carved out" portions of a single cause of action in its demurrer ruling is forfeited for lack of a contemporaneous objection, misunderstands the demurrer ruling (granting leave to amend is not a "carve out"), and incorrectly understands the law on what constitutes a cause of action in any event.

---

[11]    The trial court reasoned the Trust's declaratory relief claim "also allege[d] a due process violation" and was "subsumed within the mandamus claim."

16

Insofar as the Trust challenges the substance of the trial court's grant of the CCC's initial demurrer apart from the grant of leave to amend, that challenge fails too. The Permit Streamlining Act claim is not viable because the CCC denied the application on its merits, not because it was incomplete; section 30251's community character and section 32051's visual resources provisions are reasonably certain and not unconstitutionally vague; and the Trust was not penalized for declining assistance from CCC staff that the Trust asserts is provided to favored applicants.

Finally, with respect to the procedural due process claim that is all that was really at issue on the motion for judgment, the trial court found the claim failed as a matter of law on two alternative grounds: the Trust's failure to exhaust its administrative remedies by bringing this omission to the commissioners' attention and lack of any prejudice to the Trust from the omission. The Trust does not contest the exhaustion rationale on appeal, which alone warrants affirmance on this ground, but we will also briefly explain why the trial court correctly determined the incomplete staff report did not prejudice the Trust.

### A. *The Trial Court Did Not Abuse Its Discretion in Ruling on the Motion for Judgment Despite Untimely Service*

The CCC served its motion for judgment on the writ on March 3, 2021, 16 court days before the hearing on March 25, 2021. Because the CCC served the document electronically, it should have been served two days earlier on March 1, 2021, i.e., 18 court days before the hearing. (Code Civ. Proc., §§ 1005, subd.

(b) [moving papers generally required to be served at least 16 days before hearing], 1010.6, subd. (a)(4)(B) [extending notice period by two days "after service by electronic means"].) The trial court determined the Trust was not prejudiced by this two-day delay because the Trust "was able timely to file an opposition and [did] not show that [it] suffered any prejudice as a result of the minor delay."

We will assume for the sake of argument that the Trust's reference to untimely service in its opposition and its attorney's statement at the hearing that he "had to scramble" to file the opposition were sufficient to preserve the issue for appeal. (But see *Carlton v. Quint* (2000) 77 Cal.App.4th 690, 697 [as a general matter, "'a party who appears and contests a motion in the court below cannot object on appeal or by seeking extraordinary relief in the appellate court that he had no notice of the motion or that the notice was insufficient or defective'"].) Our review of trial court's decision on the merits, though, is for abuse of discretion. (*Bozzi v. Nordstrom* (2010) 186 Cal.App.4th 755, 765.)

The Trust does not dispute the trial court's finding that it was not prejudiced by the untimely filing and it offers no other argument that the trial court abused its discretion.[12] Rather, the Trust appears to take the position that the trial court lacked any discretion to consider a motion that is not timely served. That is

---

[12] The Trust's attorney explained at the hearing on the motion that he "had to scramble" because he "was in depositions on Monday, Tuesday, Wednesday, and Thursday of that week"— presumably the week the motion was served. If that is correct, it is not immediately apparent why service on Monday, March 1, 2021, would have resulted in less of a scramble than service on Wednesday, March 3, 2021.

18

not the law. (Cal. Rules of Court, rule 3.1300(d) ["No paper may be rejected for filing on the ground that it was untimely submitted for filing. If the court, in its discretion, refuses to consider a late filed paper, the minutes or order must so indicate"].) Given the minor delay and the fact that many, if not all, of the issues had been raised previously, the trial court was well within its discretion to consider the motion on the merits.

> B.    *The CCC Properly Relied on Extrinsic Evidence Under Section 1094*

The Trust cites Section 1094 for the proposition that the trial court was not authorized to consider extrinsic evidence—i.e., anything other than the petition itself—in ruling on the CCC's motion for judgment. Section 1094 provides as follows: "If no return be made, the case may be heard on the papers of the applicant. If the return raises only questions of law, or puts in issue immaterial statements, not affecting the substantial rights of the parties, the court must proceed to hear or fix a day for hearing the argument of the case. [¶] If a petition for a writ of mandate filed pursuant to Section 1088.5 presents no triable issue of fact or is based solely on an administrative record, the matter may be determined by the court by noticed motion of any party for a judgment on the peremptory writ."

Focusing on the first paragraph of Section 1094, the Trust contends the CCC did not make a "return" to the operative petition and, as the Trust sees it, the trial court's analysis should have accordingly been limited to "the papers of the applicant." This first paragraph of the statute, however, merely establishes a procedure for adjudicating a petition for a writ of administrative mandamus in the absence of a response by the agency—a

19

procedure that is necessary because a writ may not be granted by default.  (Code Civ. Proc., § 1088; *Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1250 ["the court cannot issue the writ by default, but rather must consider and evaluate the petition before granting the relief requested, even if the adverse party does not respond to the petition"].)  In this light, the Trust's discussion of whether the CCC was required to answer or demur to the third amended petition before submitting evidence in support of its motion for judgment misses the point.  The first paragraph of Section 1094 *authorizes* the trial court to grant a petition based on the papers of the applicant; it does not *prohibit* the trial court from considering evidence in ruling on a motion for judgment pursuant to the statute's second paragraph, which is what happened in this case when the court found the CCC was entitled to judgment as a matter of law.

We are unpersuaded by the Trust's contention that the motion for judgment was nevertheless unauthorized under the second paragraph of Section 1094 because its petition presented triable issues of fact and there was no certified administrative record.[13]  The only issue presented in the petition was an alleged

---

[13]      In its opening brief, the Trust suggests "the parties held off on preparing the administrative record" due to "numerous pleadings challenges by [the CCC]."  As of January 2021, however, the Trust's attorney acknowledged it had not paid a deposit required to prepare the administrative record and represented that the Trust would "take care of that right away."  Nothing in the appellate record indicates it did so.  (Code Civ. Proc., § 1094.5, subd. (a) ["Except when otherwise prescribed by statute, the cost of preparing the record shall be borne by the petitioner"].)

violation of the Trust's procedural due process rights. (As we shall discuss, the trial court, in its ruling on the CCC's initial demurrer, properly disposed of the other issues raised in the Trust's opening brief.) The dispositive facts relating to the Trust's exhaustion of administrative remedies and the CCC's stated reasons for denying the permit application were undisputed.

C.   *The Trial Court's Ruling on the Motion for Judgment Did Not Need to Address Issues on Which It Did Not Grant Leave to Amend*

In its order sustaining the CCC's demurrer to the Trust's original petition and complaint, the trial court granted the Trust leave to amend only to attempt to allege a violation of its procedural due process rights. When the Trust apparently disregarded the narrow scope of leave to amend granted by repeating various allegations irrelevant to procedural due process in its first amended complaint, the trial court was clear that the CCC need not respond to claims that had already been ruled on in connection with the initial demurrer: "[T]here's no reason to re-raise that or make a motion to strike or anything. Those are by the wayside as far as I'm concerned. . . . All that is left is what I gave [the Trust] to amend to allege [sic]." Notwithstanding this directive, the Trust continued to allege facts unrelated to procedural due process in its subsequent pleadings, including the operative third amended petition. The trial court refused to consider these issues in its ruling on the motion for judgment: "Contrary to [the Trust's] vague and conclusory allegation that other issues remain in the matter, the [CCC] correctly notes that the court sustained the demurrer to all claims other than the due

21

process issue, which is all that is left of the case. . . . There are no other issues, whether or not they were improperly added to the [third amended petition]."

Emphasizing that the allegations supporting its various theories all appeared under a single cause of action in the original petition, the Trust contends "[t]here is no statutory authority to use the demurrer process to 'carve out' portions of a cause of action." The issue is forfeited, however, because the Trust never raised an objection on this ground in the trial court, either in connection with the demurrer or the motion for judgment. (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264-265.) Beyond the forfeiture, the argument also misunderstands basic civil procedure in the context of this case, and for more than one reason. First, granting leave to amend is not a "carve out" of less than an entire cause of action; if the Trust had filed no amended pleading, the case would have been over because the court found the entire petition and complaint defective as then drafted. Indeed, that is why leave to *amend* was granted, and the Trust could not properly disregard the scope of the leave granted—that is what appeals are for. Second, a cause of action is not defined by a litigant's enumerated label. (*Eichler Homes of San Mateo, Inc. v. Superior Court* (1961) 55 Cal.2d 845, 847 ["'The cause of action is simply the obligation sought to be enforced.' [Citation.] The same cause of action, of course, may be stated variously in separate counts. [Citations.] In California[,] the phrase 'causes of action' is often used indiscriminately to mean what it says and to mean *counts* which state differently the same cause of action . . ."].) The trial court's demurrer ruling in this case did not impermissibly dispose of less than the full obligation the Trust sought to enforce.

D.     *Insofar as the Trust Challenges the Trial Court's Ruling on the CCC's Initial Demurrer, the Ruling was Correct*

The Trust's briefs can be charitably read to argue the trial court erred in sustaining the CCC's demurrer as to its claims that the application was complete as a matter of law pursuant to the Permit Streamlining Act, section 30251's provisions relating to community character and visual resources are unconstitutionally vague, and CCC staff improperly assists favored applicants. As we now explain, the trial court's ruling was correct.

1.     *Permit Streamlining Act*

Government Code section 65943 provides, among other things, that a permitting agency has 30 days after an application is received to determine in writing whether the application is complete. (Gov. Code, § 65943, subd. (a).) In general, if the agency fails to do so, "the application shall be deemed complete . . . ." (Gov. Code, § 65943, subd. (a).) The Trust contends CCC staff's requests for more information in January 2020 (sent more than a year after the Trust responded to its notice of incomplete application) amounted to an untimely determination that the application was incomplete. The CCC considered—and denied—the application on its merits, however, and this consideration proves the denial was not based on any asserted incompleteness. (Cal. Code Regs., tit. 14, §§ 13056, subd. (a) [a "submitted" application may be deemed "filed" only if complete], 13057, subd. (a) [staff report to be prepared "for each application filed pursuant to section 13056"].) Put differently, a court order declaring the application complete as a matter of law would not afford the Trust any effective relief because it was

23

denied on the merits.  The contention is therefore moot.  (*People v. Rish* (2008) 163 Cal.App.4th 1370, 1380 ["'[A] case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief'"].)

### 2.    *Vagueness*

"The vagueness doctrine bars enforcement of "'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." [Citations.]' [Citation.]"  (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.) "Statutory language is not impermissibly vague if its meaning can be fairly ascertained by reference to other sources, such as dictionary definitions, similar statutes, the common law, judicial decisions, or if the words have a common and generally accepted meaning."  (*Ivory Education Inst. v. Dept. of Fish & Wildlife* (2018) 28 Cal.App.5th 975, 982.)  Where, as here, a party challenges a statute as unconstitutionally vague on its face, we consider "'only the text of the measure itself, not its application to the particular circumstances of an individual.'  [Citation.]"[14] (*Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 38-39.)

---

[14]    In its briefing on appeal, the Trust suggests it alleged section 30251 is unconstitutionally vague on its face and as applied in this case.  The Trust's petition and complaint that was the subject of the demurrer presented only a facial challenge, however, based on the general lack of "guidelines" for compliance with the Coastal Act's provisions relating to visual resources and community character.  We therefore confine our analysis to the only legal theory properly presented in the trial court.

24

We will assume for the sake of argument that a determination that section 30251's provisions addressing visual resources and community character are unconstitutionally vague would warrant issuance of a writ notwithstanding the Trust's failure to challenge the denial of its permit application on section 30253 (geologic hazards) grounds as well. As pertinent here, section 30251 provides that "[t]he scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance. Permitted development shall be sited and designed to protect views to and along the ocean and scenic coastal areas, to minimize the alteration of natural land forms, [and] to be visually compatible with the character of surrounding areas . . . ."

Ordinances employing similar language to protect views and community character frequently serve as the basis for land use decisions that are upheld in the courts, without any difficulty applying the pertinent standards. (See, e.g., *Ross v. City of Rolling Hills Estates* (1987) 192 Cal.App.3d 370, 374-376, 365, fn. 2 (*Ross*) [land use permit denied based on view protection ordinance prohibiting "needless destruction and impairment of views" and providing that "views enjoyed by residents . . . will not be significantly obstructed"]; *Harris v. City of Costa Mesa* (1994) 25 Cal.App.4th 963, 968-969 [permit denied based, in part, on ordinance requiring proposed developments to be "substantially compatible with developments in the same general area and . . . not . . . materially detrimental to other properties within the area"]; *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 337 [permit denied based on ordinance requiring, among other things, accessory structures to be "architecturally compatible with overall neighborhood

25

character"].)  That is good evidence that the analogous statutory provisions challenged here are not unconstitutionally vague in all applications, and the Trust does not meaningfully grapple with these cases.  Reasonable specificity in statutory language is sufficient, and it is not "'unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.' [Citation.]" (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1117; accord *People v. Morgan* (2007) 42 Cal.4th 593, 606 ["""[a] statute is not void simply because there may be difficulty in determining whether some marginal or hypothetical act is covered by its language"""].)  The line drawn by section 30251 may require further definition when applied in a close case—though not all cases, which dooms a facial challenge—but it is not a line that requires guessing at its meaning or invites arbitrary enforcement.

### 3. Substantive due process: CCC staff assistance to other applicants

Section 30335.1 provides that the CCC "shall provide for appropriate employees on the staff of the commission to assist applicants and other interested parties in connection with matters which are before the commission for action.  The assistance rendered by those employees shall be limited to matters of procedure and shall not extend to advice on substantive issues arising out of the provisions of this division, such as advice on the manner in which a proposed development might be made consistent with the policies specified [elsewhere in the Coastal Act]."  In all iterations of its petition and complaint, the Trust alleged CCC staff provides prohibited substantive

assistance to favored applicants and cited staff reports discussing other applications—noting, for example, that "the applicant worked with [CCC] staff in order to resolve . . . visual incompatibilities with the surrounding neighborhood" and "[s]taff worked with the applicant to revise the building design to relocate the parking space to the eastern side of the project lot."

Assuming without deciding that the Trust's construction of section 30335.1 is correct,[15] the Trust still failed to state a claim that its substantive due process rights were violated. (*Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1032 ["arbitrary government conduct that triggers a substantive due process violation is not ordinary government error but conduct that is in some sense outrageous or egregious—a true abuse of power"].) Moreover, the materials submitted in support of the petition contradict the Trust's claim that it was penalized for its scrupulous adherence to the statute. Rather than declining substantive assistance from CCC staff, the Trust demonstrated its unwillingness to meaningfully consider alternative plans by, for example, taking the unsupported position that the proposed development would stabilize the hillside in a "more effective and aesthetically pleasing" manner than any alternative.

E. *The Trust's Procedural Due Process Claim Lacks Merit*

1. *Exhaustion*

In determining that the Trust was required to inform the CCC that the one-page Diagram was missing from the materials

---

[15]    The CCC contends a matter is not "before the commission for action" for purposes of section 30335.1 until the hearing date.

27

submitted with the staff report if it wanted to allege a violation of its procedural due process rights, the trial court "applied a branch of the exhaustion doctrine known as issue exhaustion. Issue exhaustion means that '[a]dministrative agencies must be given the opportunity to reach a reasoned and final conclusion on *each and every issue* upon which they have jurisdiction to act before those issues are raised in a judicial forum.' [Citation.] This doctrine bears some resemblance to the judicial rule that an argument that was not presented to a lower tribunal will not be entertained by a reviewing court. [Citation.] When it applies, an issue exhaustion requirement advances the general purposes of the exhaustion rule by, among other things, discouraging the presentation of skimpy '"skeleton"' arguments to an administrative agency. [Citation.]" (*Hill RHF Housing Partners, L.P. v. City of Los Angeles* (2021) 12 Cal.5th 458, 479; *Greene v. California Coastal Com.* (2019) 40 Cal.App.5th 1227, 1237-1238 [applicant who failed to raise issue at CCC hearing did not satisfy exhaustion requirement].)

In its opening brief, the Trust did not challenge the trial court's conclusion that it did not exhaust its administrative remedies; moreover, the CCC discusses the issue in its respondent's brief and the Trust has no rebuttal in its reply. The Trust has therefore forfeited any challenge to the trial court's determination that it failed to exhaust its administrative remedies. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 [even where "review is de novo, review is limited to issues adequately raised and supported in the appellant's brief"].)

*2.    Prejudice*

Even putting the forfeiture aside, the undisputed evidence establishes the Trust was not prejudiced by the staff report's omission of the Diagram. "[P]rocedural due process violations, even if proved, are subject to a harmless error analysis. [Citation.]" (*Hinrichs v. County of Orange* (2004) 125 Cal.App.4th 921, 928.)

Contrary to the Trust's reading of the commissioners' remarks during the hearing on its application, there is no indication the map would have impacted the CCC's analysis. A majority of the commissioners stated on the record that the proposed development was inconsistent with the Coastal Act. The presenting staff member stated at the hearing that the staff's "recommendation for denial [was] not based on the fact that [it] didn't have all the information. . . . [W]hat staff really focused on . . . was just, again, the land form alteration, and the community character aspects of this project."[16] And the findings included in the staff report, which the commissioners adopted at

---

[16]    The Trust notes the same staff member said the Trust's response to the notice of incomplete application "didn't include all of the materials requested, namely the caisson plans[ ] and the project alternatives analysis." According to the Trust, this amounted to a misrepresentation that the Trust had not responded with any sort of alternatives analysis. In context, however, the staff member's statements reflect a determination that the materials submitted were not responsive to the agency's requests. Apart from the Diagram, which was referenced in other materials shared with the commissioners, the commissioners received all materials analyzing project alternatives.

the hearing,[17] detail the proposed development's inconsistencies with the Coastal Act.

All the Trust offers to argue the contrary is its emphasis on two remarks by commissioners that it construes as calling for additional information that it asserts could be found in the Diagram. First, Vice Chair Brownsey asked whether the "extremely hazardous" nature of the property called for "an incredible amount of technical information." But the Diagram does not address these hazards in any way, and it can hardly be said to provide "an incredible amount of information" on any topic. Second, Commissioner Rice wondered whether the property might have become "completely unbuildable" to the point that denial of the application would effect an unconstitutional taking. According to the Trust, this line of questioning suggests that, had the commissioners been presented with the Diagram, "they would have either moved forward with approval or a taking." Putting aside the fact that Commissioner Rice was the only member of the panel who mentioned this issue—and the vote to deny the application was unanimous—the Trust takes an exceedingly narrow view of the options available to the commissioners. There is nothing in the record to indicate the proposal sketched in the Diagram represents the only

---

[17] Independent of Chair Padilla's pronouncement that "the relevant findings are adopted," regulations implementing the Coastal Act provide that, "[u]nless otherwise specified at the time of the vote, an action taken consistent with the staff recommendation shall be deemed to have been taken on the basis of, and to have adopted, the reasons, findings and conclusions set forth in the staff report as modified by staff at the hearing." (Cal. Code Regs., tit. 14, § 13096, subd. (b).)

economically viable alternative to the proposed near-20,000 square foot project.

## DISPOSITION

The judgment is affirmed.  The CCC and the City shall recover their costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

MOOR, J.